We'll move to the next case of the day, Brown v. Commissioner Sola, and we'll hear first from Mr. Horn. Your Honors, Counsel, Ladies and Gentlemen, I'm John Horn, I represent Plaintiff Appellate Gerald Lewis Brown, Jr. The heart of this case lies in Mr. Brown's hands. The Administrative Law Judge decided that while his hands were limited to occasional handling and fingering, he was completely disabled. But then she went off and played doctor and decided that without a medical opinion and against the evidence that he could use his hands frequently. So he was found disabled from June 24, 2014, and he was found to have improved July 7, 2015. And he was found to have improved from occasional use of the hands to frequent use of the hands on the basis of an internal medicine examination that did not include the tests for tremors which limited him to occasional use of the hands. There was a neurological exam in June 2015 that employed the correct maneuvers to determine whether there were tremors. And those maneuvers were writing his name and drawing a spiral and pouring water from cup to cup. Those revealed tremors in June 2015. At the consultative medical examination on which the Administrative Law Judge relied to decide that his condition had improved from occasional use of the hands to frequent use of the hands, those maneuvers were not performed. At the next- Is that the doctor, just to reference this in terms of people, is that Dr. Patil? Correct. Okay. The next doctor, Dr. Ahmed, performed a neurological exam in June 2016, and once again the correct maneuvers revealed the presence of tremors. So there was no basis in the evidence to find that the tremors had improved so that he could use his hands frequently. Is it not odd, though, Mr. Horne, that in Dr. Patil's paperwork, there's no mention at all of tremors? Not only not detected from the testing, I know it's incorrect testing, right? I mean, you've made your points very clear on that. But the claimant doesn't seem to have mentioned tremors. There's just a complete absence of any mention of tremors. Is that not odd? Yes. Yes, he's a terrible historian. There's no question about that. But Dr. Brown. But Dr. Patil did- Because tremors were a big issue at that point in time, at least according to Mr. Brown's own account. It just seems very odd to me that you'd go to this evaluation by Dr. Patil and there'd be no mention of tremors, separate and apart from whatever the test results showed and whether they're the correct tests or not. Especially a matter of days after he had been examined in June 2015, a neurological exam. It's almost as if Mr. Brown went to Patil and said, I'm doing fine. I mean, that's my words, not his, but that's the impression I got from the paperwork anyway. Dr. Patil did note, however, that Brown was taking Primadom, which is the tremor drug. So, if he wanted to find out about it, he could have asked Brown. And if he knew the tests to employ to detect tremors, he might well have done that. But it seems to me that, I mean, I'm just inferring, he either didn't know the tests or he didn't care. Can I ask you one other question? Yes. Okay. It's a point of confusion, okay? Maybe you just help me out here. There's a bunch flying around in the briefing and in the orders about the claimant's loss of insurance coverage or loss of medical coverage sometime, as best I can figure it out, around this mid-2015 time period. And the question I had is, how does that affect what we see and don't see in the medical records in your view? Okay. I'm just not, in other words, I need your help on this as a factual matter. I'm not sure what to make of this. I'm happy to help, if I can. Well, once your medical insurance changes, you've got to get a new primary care doctor. And that happened here when, in mid-2015? Sometime in mid-2015. And it took a while for there to be a referral to another neurologist. All right. And where he goes, this is where he goes from a union-based health plan to Medicaid, right? It appears, yes. He had an exam by his second neurologist, Dr. Erickson, in June 2015. And that's apparently when Dr. Erickson informed claimant that, well, he didn't take that, he wasn't going to take that kind of insurance anymore. So then the natural course of things would have been for Brown to get a new primary care doctor and then get a referral to a new neurologist. But he also had to get referrals for other matters, like cardiology. So it took time. And you've got to remember that Brown was, he lived with a woman who was disabled. So here you've got these two disabled people, and it's not, it's not that easy. Well, the best I was able to piece this together, I think, I might be mistaken, the commissioner will correct me on this if I'm wrong, that the commissioner is kind of casting this as he went for a one-year period, and we don't have any idea whether the tremors were going on or not going on, and maybe they disappeared and came back later. I'm not so sure that that's the correct view of the record, though, because if he lost the coverage in mid-15, this new primary care doctor, this Rogers fellow, prescribes tremor medicine in January of 16. So at best, we have a six-month gap, as I read the record, where there's no tremor medication. And the reason for that may be this insurance question that I was asking. Right. Not that the tremors disappeared as a medical or health matter. Well, of course they didn't. They don't, they didn't just, it's like if you said that they disappeared between each of the exams that showed them. But the reason I'm using language like that is because the ALJ saw these tremors as on again, off again. And I read your brief to say, no, no, no, it's not like an on-off switch. They're always on. The reason we don't see evidence of it is because of this insurance issue. Right. Right. And when, at four of the five neurological exams, they were present. So if they're off again, on again four out of five times, let's say they're off again, on again four or five days, well, they're effectively disabling him. The administrative law judge failed to get a medical opinion. No medical opinion supports her finding that his condition improved. And as I said, the evidence goes the other way. Likewise, the evidence supports the treating physician's opinion, Dr. Nagurbati, his opinion of the claimant's ability to stand and walk. Because in many examinations, Mr. Brown had an antalgic gait, or he had reduced sensation in his legs, or he had reduced reflexes, or he was using a cane, or he had difficulty with his ankle, which he broke in August 2014 because he couldn't feel the way down the So either because he was limited to no more than sedentary work, or because the administrative law judge was incorrect in playing doctor and finding that he could use his hands frequently, this case should be reversed and remanded. Any other questions I can help with? Thank you. Thank you very much, Mr. Horne. For the commissioner, Mr. Adili. Good morning, Your Honors, may it please the court, Javid Adili on behalf of the commissioner. Substantial evidence supports the ALJ's decision in this case that Mr. Brown was disabled from his alleged onset date in March of 2014 through July 7th of 2015, the date that Dr. Patil performed the second consultative examination, but not after that time. Mr. Brown's brief makes the most salient issue in this case the ALJ's examination of his tremors. Will the ALJ express throughout her decision a skepticism about Mr. Brown's statements about his tremors, noting that there were discrepancies in his report of the onset of the tremors. Sometimes he told the ALJ at the hearing, in fact, I don't remember the pin site but it's between pages 61 and 71 of the transcript, that the tremors began on or about the time of his heart surgery in April of 2014. But he told his doctors at least twice that they started about a year earlier, which would have meant, in the ALJ's view, and the ALJ says this in the decision, that he was able to work for about a year with these alleged tremors. So there's that issue of onset. But then the ALJ was also concerned that there were discrepancies in his reports about the persistence and intensity of those tremors. So in April of 2014 he established care with Dr. Erickson. At that time Dr. Erickson said that he was leery of treating the tremors because they could be exacerbated by other acute impairments like his coronary artery bypass graft surgery, which had just taken place. In November of 2014, Dr. Erickson observed no tremors. So too in October of 2014, the first consultative examination, Dr. Carlton observed no tremors and performed a significant amount of manipulative testing. So both Drs. Carlson and Dr. Patil, who performed the examination in July of 2015, who admittedly were not neurologists, but Dr. Carlson was a rehabilitative specialist and Dr. Patil was an internist, both of them qualified to observe tremors if they exist, if they're present. I want you to go back to your narrative, and all I mean to do is interject one question. Why are you focused on that period of time? Because I don't understand, you're not asking us to reverse this award of benefits right from that March 14 to July 15. That's the only thing that confuses me. I thought if you're going to talk about a time period, you'd be talking about July 2015 forward. Well, and I'm happy to address that, Your Honor, and in fact, if you'd like, I'll address that now. No, no, I just want to tell you what's running through my mind as you're going through this pre-2015 chronology. To directly answer your question, Your Honor, is I want to make clear to the court why the ALJ thought the limitations that she afforded Mr. Brown for the closed period were confined to that period. Because what the ALJ then did was, after noting all of this evidence that suggested a conflict, noted that Mr. Brown didn't report to his doctors for about a year after the June 2015 examination with Dr. Erickson, where Dr. Erickson informed him that he would no longer take his insurance. Didn't report to his doctors, including to his new internist, that he had tremors. Now it's true that the doctor noted that he was continuing the primidone, right? But didn't report tremors and didn't exhibit tremors on examination for that one year period. Also, just to answer the question you raised to opposing counsel, on page 1242 of the record, June 1st, 2015, the doctor's note shows that at that time, June of 2015, he had already gotten, he had just gotten the Blue Cross Blue Shield Medicaid insurance. That there's a note at that point in the record. So for that period, from June 2015 to June 2016, he had medical care, but wasn't going to the doctor for his tremors. Now the ALJ noted... Well, hold on, hold on. In January of 2016, is it not true that Dr. Rogers, the new primary care physician, prescribed tremor medication? Did. That's correct. So he saw some doctor and tremors somehow must have come up. But didn't report tremors. Didn't complain of tremors. How does he get the prescription? I mean, the doctor's not just going to randomly prescribe tremor medicine. Certainly not. But if a prescription controls symptoms such that the tremors are not causing limitation, then that's also not a reason to give a limitation based on tremors. And then didn't seek specific treatment for the tremors in terms of complaining of tremors until later. But the other thing is the ALJ was concerned that this is an individual that complained at the hearing on pages 61, 63, 69, 71 of the transcript of persistent daily tremors that caused him to be unable to hold a hamburger, to move a chess piece, to season meat, season chicken on his own, and claimed that that was daily, that he daily had these tremors. And the ALJ reasonably contrasted that report against the record that often showed him not to exhibit tremors. And, indeed, at both consultative examinations, not even to report them, and then not to have them observed, even though both consultative examiners found, asked him to squeeze a blood pressure cuff bulb, pick up a coin, pick up a pen, pick up and hold a cup, unbutton and button, and tie shoelaces. All of which, if he had an action tremor that was active at that time, would have been, you would, ALJ said you would reasonably expect would have caused a tremor at that time. And so what the ALJ said was, Dr. Erickson stated that other impairments could exacerbate the tremors. Right? On page 21 of the ALJ's discussion, which is a discussion at step two, says, accordingly, it appears that the tremor has escalated for a period in correlation to his other medical impairments, relying on Dr. Erickson, who said that at page 1092 of the record. And then noted that Dr. Nimagata, who expressly cited the coronary artery bypass graft and the broken ankle as two of the three impairments underpinning her opinion, which ran from March of 2014 through the date of the opinion, on February of 2015, with the directions of the form that she was given, asked her to specifically opine through the present day, opined disabling limitations that included a limitation to only occasional manipulation, occasional handling, and fingering. What the ALJ said was, in an abundance of caution, citing both Dr. Erickson's opinion and Dr. Nimagata's opinion, I'm going to find a closed period here. But I don't believe that those limitations are in place afterwards. And in fact says, with respect to Dr. Nagabati's, the treating source's opinion, during the closed period of disability, the undersigned gives the claim of the benefit of the doubt on the tremors and his decreased ability to use his hands. This is consistent with the medical evidence supporting more problems with other conditions. And the record supporting tremors could increase with the stress of other additional medical issues. And that's on page 22 of the record, citing Dr. Nagabati's opinions, which are at 1126 to 1128. Opposing counsel asks the court to focus on the fact that the consultative examiners were not neurologists, but they performed testing that the ALJ reasonably thought would reasonably have produced tremors if they were present. With respect to the insurance, he had insurance from 2015 to 2016, and didn't, although he did get... He had Medicaid, right? He had Medicaid, right. And established care six months later with an internist, and at that time didn't complain of active tremors, and didn't exhibit tremors on examination, although he did receive medication. Well, and the guy prescribed it. I mean, right, Rogers prescribed tremor medicine. But it wasn't even listed in his active diagnoses for the three visits with Rogers. The reason I meant, so the concern that I have is this on-again, off-again reasoning. When Rogers prescribes tremor medication in January of 2016, and then I think in June of 2016, Dr. Ahmed, is it? Dr. Ahmed. Dr. Ahmed finds neurologists, finds severe tremors, stay on the medicine. I don't know where the off-again part of this comes from. Maybe, I mean, it seems like they're always on to me. I think that's a difficult... I think my response would be that the... I see that my time is about to expire, but the ALJ could reasonably have looked at this record and concluded otherwise. The record is replete with evidence that Mr. Brown often did not present with tremors, even though his allegation was that they were persistent and daily. And that the ALJ could have, and in this case did, reasonably think that the clash between his statements about the intensity and the persistence, and indeed the onset of those limitations, rendered his statements about the degree to which they limited him, especially after that closed period, unreasonable. And not worth... I see that my time has expired. Go ahead and wrap up. Pardon? Go ahead and wrap up, Mr. Adili. For the reasons expressed in our brief, we ask that the Court confirm. Thank you. Okay. Thank you very much. Rebuttal? Mr. Horne. Thank you. A whole line of cases say that this judge, administrative law judge, should have gotten a doctor's opinion. Golan, Stage, Marino, Lambert, even Murphy v. Berryhill, 727 Federal Appendix 202, there was a medical expert called at the final hearing in that case. I was there. I did that case. I did Murphy v. Colvin, which was the predecessor of that case. Murphy's claim went to this Court twice. So there should have been a doctor, and if there was a tremor absent on this opinion or that, well, Dr. Erickson said, tremors come and go. So four out of five neurological exams showed they were present. Thank you, Mr. Horne. Thank you. Our thanks to both counsel. The case is taken under advisement.